UNITED STATES of America,
Plaintiff–Appellee,

v.

Darryl FREEMAN, Tyrone Netters,
Defendants–Appellants.

Nos. 92–10094, 92–10102.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 14, 1993.

Decided Sept. 22, 1993.

Arthur W. Ruthenbeck, Federal Public Defender, Ann C. McClintock and Daniel J. Broderick, Asst. Federal Public Defenders, Sacramento, California; Robert M. Wilson, Segal & Kirby, Sacramento, CA, for defendants-appellants.

Bradford C. Lewis, Asst. U.S. Atty., Sacramento, CA, for plaintiff-appellee.

Before: LAY,[*] HUG, and SCHROEDER, Circuit Judges.

HUG, Circuit Judge:

Appellants Netters and Freeman were indicted as a result of an FBI sting operation aimed at identifying corruption in the California state legislature. Netters was convicted of one count of violating RICO, three counts of extortion in violation of the Hobbs Act, four counts of money laundering, and one count of subscribing to a false tax return. He challenges all of his convictions, except subscribing to a false tax return. Freeman was convicted of conspiring to and aiding and abetting extortion in violation of the Hobbs Act. He appeals both of his convictions.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We exercise jurisdiction over these timely appeals pursuant to 28 U.S.C. § 1291. We affirm.

## I. BACKGROUND

In 1986, the FBI initiated an undercover investigation into suspected corruption in the California legislature. The investigation arose as the result of conversations in 1982 between Marvin Levin, who was working as a citizen informant for the FBI, and Freeman, who was then employed as a legislative staff member for the California Assembly. During these conversations, Freeman made statements indicating that special interest legislation could be purchased in the California legislature and that he expected to be paid for his efforts as a staff member.

In January 1986, Levin introduced FBI Special Agent John Brennan to Freeman. Freeman was then president of the Superior Valley Rural Small Business Development Corporation ("Superior Valley"), which administered a state-subsidized loan guarantee program. Levin introduced Brennan as an officer of Gulf Shrimp Fisheries, Inc. of Mobile, Alabama, and Gulf Shrimp West, Inc. of California ("Gulf Shrimp"). The FBI created these fictitious entities for purposes of the undercover operation. Brennan told Freeman that Gulf Shrimp was interested in expanding its operations in Northern California and that it needed two things to facilitate the expansion: (1) a guarantee from Superior Valley for a loan to finance part of the expansion and (2) special interest legislation to

[*] Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

allow more extensive financing of its expansion through industrial development bonds.

The loan guarantee was a device to enable the FBI to explore Freeman's prior statements about purchasing legislation without actually becoming involved in the legislative process. Brennan gave Freeman two $1,000 payments for his assistance, as president of Superior Valley, with the loan guarantee.

The proposed legislation was intended to allow Gulf Shrimp to market an industrial development bond to a California savings and loan association. The proposed bill was to be drafted to apply only to Gulf Shrimp to make it obvious that the bill was special interest legislation. Without the legislation, an industrial development bond issued by Gulf Shrimp would not have been a permissible investment for a California savings and loan. Freeman agreed to help Brennan obtain this legislation.

During the first five months of 1986, Freeman took steps to find a legislator who would sponsor the special interest bill in return for payments. On June 16, Freeman introduced Brennan to Netters, a legislative aide to Assemblyperson Gwen Moore of the 49th Assembly District. The three men discussed the bill's status and the need to locate an author to carry it. According to Netters, he agreed to approach Moore about the bill because it supported a small business and had the potential for generating jobs for minorities and women.

Later the same day, Freeman called Netters and negotiated the payment required for Moore's authorship and Netters' assistance. After concluding the call, Freeman told Brennan that Moore would author the bill, but that Netters required a contribution of $5,000 to Moore's campaign committee. According to Freeman, the first $2,500 payment was to be made when the bill cleared the Assembly's Finance and Insurance Committee, and the second $2,500 payment was to be made when the bill passed the Assembly. Freeman also told Brennan that Netters wanted to be a "consultant" and that Freeman would arrange to pay Netters directly. Freeman accepted a payment of $2,500 from Gulf Shrimp for helping to find a sponsor for the bill. The next day, Freeman told Brennan that Netters required a $500 cash payment in return for his assistance in moving the bill, but Freeman never paid Netters this money.

As the deadline for introducing new legislation had passed, Freeman identified an existing bill which could be gutted and used as a vehicle for Gulf Shrimp's interests. Netters was assigned the responsibility of moving the bill, AB 3773, through the legislative process. Shortly after Freeman and Netters negotiated the amount of the payments required for Netters' assistance, Netters contacted the legislative aide for the assemblyperson carrying the original version of AB 3773 to coordinate the highjacking of the bill. Netters secured a rule waiver from an Assembly Rules Committee staff member so that the highjacked bill could be reassigned to the Assembly Finance and Insurance Committee. Netters also submitted the new special interest language for the bill to Legislative Counsel for drafting.

On June 20, Brennan called Netters at work and asked him when the "backside" payment of $2,500 was due. Apparently, Netters was concerned about the call because Freeman later chided Brennan about it, telling Brennan that "[Netters] insinuated that I'm getting him involved in some ab-scam, ab-scam thing or something like and I'm going no, no, no...." In response to Brennan's apology for being too explicit on the telephone, Netters said that "[s]ome things are best never said."

On June 23, the amended version of AB 3773 was sent from Legislative Counsel to the Finance and Insurance Committee. On the following day, Brennan gave Netters the "front-end" money in the form of a check for $2,500 payable to the Friends of Gwen Moore.

In June, Freeman began renting office space from Northern California Research Associates ("NCRA"), a Sacramento consulting firm. On June 23, Freeman told Brennan that Netters would prefer to receive his "consultant fee ... straight cash under the table ... through me" or "through ... NCRA."

On July 10, AB 3773 passed the Assembly and was sent to the Senate for hearing in

August. Thereafter, Netters appeared before the Senate Rules Committee to obtain a file notice waiver so that the Senate Banking and Commerce Committee could hear the bill on an expedited basis. The bill would have been dead for the 1986 legislative session without this file notice waiver. Netters, Freeman, and Brennan then met with the Senate Banking and Commerce Committee's consultant to allay the consultant's concerns about the special interest nature of the bill. The bill passed the Senate committee only after Assemblyperson Moore agreed to a demand by the committee chairperson, Senator Rose Ann Vuich, to delete the special interest language from the bill. On August 13, Netters sent the bill to the Senate Floor without amending it because Brennan told Netters that he wanted to retain the controversial language.

Later that day, Brennan gave Netters the "back-end" payment in the form of a check for $2,500 payable to the Friends of Gwen Moore. At Netters' request, Brennan did not date the check. Netters also asked Brennan to write him a second undated check for $2,500 to replace the check for the "front-end" payment, which Netters had held in a file to conceal the timing of the contribution and to avoid the appearance of bribery.

When Senator Vuich realized that the bill had not been amended as agreed, Netters had the bill sent to the inactive file in the Senate. On August 15, after Netters told Brennan that the special interest language would have to come out, Brennan instructed Netters to kill the bill. The two undated checks Brennan had given Netters on August 13 were dated August 15 and deposited into Moore's campaign account.

On August 23, Brennan told Netters that he wanted to revive the bill in order to improve his bargaining position in the sale of Gulf Shrimp. Without Moore's knowledge, Netters had the bill removed from the inactive file. When Netters later became upset with Brennan, he had the bill returned to the inactive file. On August 27, Netters complained about the numerous obstacles that the bill had encountered and indicated that Brennan would have to make additional payments to Freeman to secure Netters' continued assistance.

Subsequently, Freeman explained to Brennan that it would be difficult to revive AB 3773 because Netters had already cashed the two checks payable to Moore's campaign committee. Freeman stated that Netters would revive the legislation but that the revival would cost considerably more money. Freeman told Brennan that he would have to provide a check for $8,000 payable to NCRA as a "down payment" and to replace the $5,000 that Moore would return with a note explaining that the checks had been cashed by mistake. Further, Freeman told Brennan that he would have to make an additional payment of $27,000 to secure Netters' assistance with the bill. On August 27, Brennan gave Freeman an $8,000 check payable to NCRA.

On August 28, Freeman told Brennan that Moore had agreed to revive AB 3773 and to assist with its passage through the Senate. Moore returned the $5,000 contribution that Gulf Shrimp had made to her. On August 29, AB 3773 was passed by the Senate and the Assembly.

Later that day, Brennan told Freeman that he was in a serious dispute with the purchasers of Gulf Shrimp and that he now wanted AB 3773 vetoed to exact revenge. Freeman told Brennan that first he would have to pay the $27,000 he owed for getting the bill passed. Brennan provided Freeman with a check for $20,000 payable to NCRA. Freeman also told Brennan that he would have to pay the remaining $7,000, plus an additional $8,000, to obtain Netters' assistance in getting the bill vetoed. Brennan gave Freeman one check for the remaining $7,000 and another check for $1,000 as a down payment on the additional $8,000.

In late September, Netters told Brennan that he was making progress toward getting the Governor to veto the bill. Prior to the veto, a member of the Governor's staff received a call from a member of Assemblyperson Moore's staff, and the caller indicated that Moore would not be troubled by a veto of AB 3773. The Governor vetoed the bill at the FBI's request.

From September through December 1986, Freeman continued to seek payment of the $7,000 he believed Brennan owed him and Netters for their services in arranging for the bill's veto. In December 1986, the three men met about the outstanding debt, and Netters discussed the powers he possessed as a legislative staff member and stated that he and Assemblyperson Moore were "inseparable" and that he spoke for her.

At trial, the evidence showed that Freeman made several disbursements through NCRA with the funds he had received from Gulf Shrimp. He made a $3,500 campaign contribution to Moore's campaign account as well as a $2,600 campaign contribution to a campaign account to assist Netters in his race for the Sacramento Municipal Utility District's board of directors. He also wrote three checks directly to Netters for $2,000, $1,000, and $200. Freeman claimed that these payments were in exchange for consulting work that Netters had performed for NCRA, but his testimony was contradicted by NCRA President Peter Lauwerys, who testified that he was not aware of any work Netters did for NCRA and never saw any work product created by Netters.

In 1988, the FBI initiated the second phase of its investigation with the assistance of John Shahabian, an aide to former Senator Paul Carpenter. Shahabian had agreed to cooperate with the Government out of concern for his own criminal liability for activities in which he had participated in 1986.

In January, Shahabian contacted Assemblyperson Moore and Netters about reintroducing the special interest legislation. Shahabian proposed legislation substantially identical to AB 3773 to benefit Gulf Shrimp's ostensible successor in interest, Peach State Capital and Peach State Capital West ("Peach State"). FBI Special Agent George Murray posed as George Miller, the president of Peach State. Freeman was not involved with the 1988 legislation.

After Moore agreed to carry the special interest bill, AB 4203, Netters and Shahabian met to discuss the need for contributions and Netters' concern that the contributions not be tied directly to the bill. Shahabian told Netters that he was budgeting between $50,-000 and $70,000 for the bill's passage through both the Assembly and the Senate. Netters responded that if $25,000 were budgeted for the Assembly, he wanted $8,000 of that amount for himself; if $35,000 were budgeted, he wanted $10,000 for himself.

In late February, Moore introduced AB 4203 in the Assembly's Finance and Insurance Committee. During late February and early March, Netters began demanding payments to Moore's fundraisers and to his own campaign fund. As he had in 1986, Netters took action to move the bill through the legislative process. Netters asked Legislative Counsel to draft a spot bill for the new legislation, and he made sure that the special interest amendments were submitted to and properly drafted by that office in March. Netters continued to demand payments. On March 22, Shahabian gave Netters a Peach State check for $1,500.

In April and May, Netters and Shahabian met on a regular basis to discuss the progress of AB 4203. Netters continued to work to move the bill out of the Finance and Insurance Committee and through the Assembly. On April 14, Netters told Shahabian that he would meet with the Finance and Insurance Committee's consultant before the committee's hearing on the bill and that he would need another $2,000. When the committee postponed its hearing on the bill, Netters complained to the committee secretary that he had witnesses scheduled for the original hearing and that the bill was the same as that introduced in 1986.

After the bill passed the committee, Netters told Shahabian that the bill was approved because he and Moore had "worked" the committee members. Netters also discussed his strategy of getting the bill through the Assembly by having it placed on the consent calendar. Netters renewed his demands for payments, and Shahabian gave Netters another $1,000 check. That same day, Netters wrote a letter on Moore's letterhead to obtain a necessary urgency clause amendment for AB 4203.

During May and June, Netters continued to move the bill through the legislature and to seek payments from Peach State for his

services. On June 2, Netters told Shahabian that he spoke with the Senate Banking and Commerce Committee's consultant to get a favorable analysis of the bill. On June 29, Netters met with FBI Agent Murray, posing as president of Peach State, to discuss the remaining payments due Netters and Moore's campaign fund. Netters told Murray that he wanted what was left in the "kitty" for himself. Murray and Netters ultimately agreed on a $2,000 check payable to Netters. From January through June, Netters received a total of $6,500 in exchange for his assistance in moving AB 4203 through the Assembly.

On May 19, AB 4203 passed the Assembly. On June 30, the bill passed the Senate and was sent to the governor. On July 8, Netters drafted and sent a letter to the governor on Assemblyperson Moore's letterhead urging him to sign the bill. The governor vetoed the bill.

## II. NETTERS' CONVICTIONS

### A. *Netters' Rule 29 Motion for Judgment of Acquittal*

Netters challenges his convictions for RICO and Hobbs Act violations[1] on the ground that he could not have committed extortion "under color of official right" within the meaning of the Hobbs Act. Netters asserts that as a nonelected, nonappointed, legislative aide employed by an elected state assemblyperson, he could not act "under color of official right."

When reviewing a district court's denial of a motion for acquittal, we examine the evidence presented in the light most favorable to the Government to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Shirley*, 884 F.2d 1130, 1134 (9th Cir.1989) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)). We review the district court's interpretation of the applicable stat-

ute, in this case the Hobbs Act, 18 U.S.C. § 1951, de novo. *See United States v. Brannan*, 898 F.2d 107, 109 (9th Cir.), *cert. denied*, 498 U.S. 833, 111 S.Ct. 100, 112 L.Ed.2d 71 (1990).

The Hobbs Act provides, in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,-000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

. . . .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or *under color of official right*.

18 U.S.C. § 1951 (emphasis added).

The Hobbs Act does not define "under color of official right." Furthermore, the Ninth Circuit has not directly addressed the question of whether a defendant must be an elected or appointed public official in order to act "under color of official right." The majority of our cases in this area involved either elected or appointed officials. *See United States v. Carpenter*, 961 F.2d 824 (9th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 332, 121 L.Ed.2d 250 (1992) (state senator); *United States v. Montoya*, 945 F.2d 1068 (9th Cir. 1991) (state senator); *United States v. Egan*, 860 F.2d 904 (9th Cir.1988) (city councilperson); *United States v. Bordallo*, 857 F.2d 519 (9th Cir.1988), *amended on unrelated grounds*, 872 F.2d 334 (9th Cir.1989), *cert. denied*, 493 U.S. 818, 110 S.Ct. 71, 107 L.Ed.2d 38 (1989) (governor); *United States v. Gates*, 616 F.2d 1103 (9th Cir.1980) (director of county business license bureau).

---

**1.** Specifically, Netters appeals his convictions for (1) conducting an enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c); (2) conspiracy to affect commerce by extortion under color of official right in violation of 18 U.S.C. § 1951; (3) extortion under color of official right and aiding and abetting in violation of 18 U.S.C. §§ 1951 and 2; and (4) extortion under color of official right in violation of 18 U.S.C. § 1951.

Recently, we decided a case involving defendants charged with Hobbs Act extortion who had been hired to serve as advisors and consultants to the mayor and the Department of Public Works; however, the case did not go to the jury on a "color of official right" theory. *See United States v. Dischner*, 974 F.2d 1502, 1515 n. 15 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993).

We have decided some cases which suggest that a private person may act "under color of official right." *See United States v. Ward*, 914 F.2d 1340 (9th Cir.1990) (defendant, who pretended to be an undercover agent for the Department of Transportation, convicted of attempting an act of extortion in violation of the Hobbs Act); *United States v. Bagnariol*, 665 F.2d 877 (9th Cir.1981), *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982) (defendant, who was a lobbyist and secretary of the Cardroom Owners Association, was convicted of an attempt to extort from a fictitious corporation in return for his help in enacting legislation favorable to gambling in Washington). However, the defendant in *Ward* was prosecuted on a "fear" theory, and it is unclear which theory of Hobbs Act extortion was utilized in *Bagnariol.*

Today we join the other circuit courts which have applied official right extortion under the Hobbs Act to nonelected, nonappointed, government employees, such as Netters. *See, e.g., United States v. Wright*, 797 F.2d 245, 249–50 (5th Cir.1986), *cert. denied*, 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987) (assistant city attorney); *United States v. Rindone*, 631 F.2d 491, 494–95 (7th Cir.1980) (municipal electrical inspector); *United States v. Cerilli*, 603 F.2d 415 (3d Cir.1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980) (superintendent and assistant superintendents of state department of transportation); *see also United States v. Ray*, 690 F.Supp. 508, 510–12 (M.D.La.1988) (aide and assistant to the governor).

■ On its face, the Hobbs Act does not limit official right extortion to "public officers." Rather, it applies to anyone acting "under color of official right." As the Supreme Court has stated, "the statutory language and the legislative history of the Hobbs Act impels us to the conclusion that Congress intended to make criminal all conduct within the reach of the statutory language." *United States v. Culbert*, 435 U.S. 371, 380, 98 S.Ct. 1112, 1117, 55 L.Ed.2d 349 (1978). We conclude that the Hobbs Act reaches anyone who actually exercises official powers, regardless of whether those powers were conferred by election, appointment, or some other method.

■ Furthermore, we conclude that the Hobbs Act reaches those public employees who may lack the actual power to bring about official action, but create the reasonable impression that they do possess such power and seek to exploit that impression to induce payments. *See, e.g., United States v. Blackwood*, 768 F.2d 131, 134–36 (7th Cir.), *cert. denied*, 474 U.S. 1020, 106 S.Ct. 569, 88 L.Ed.2d 554 (1985); *United States v. Margiotta*, 688 F.2d 108, 132–33 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Mazzei*, 521 F.2d 639, 643–44 (3d Cir.), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *United States v. Wingo*, 723 F.Supp. 798, 803–04 (N.D.Ga.1989). The district court's instructions correctly enunciated this principle.

■ Accordingly, we reject Netters' contention that as a nonelected, nonappointed, legislative aide, he could not act "under color of official right." There was ample evidence that legislative aides exercise a great deal of control over pending bills in the legislative process. Moreover, the Government presented a substantial amount of evidence that Netters not only created the impression that he could affect legislation, but also that he did, in fact, use his official position to shepherd both AB 3773 and AB 4203 through the legislative process to induce payments from the undercover FBI agents.

■ Because the evidence demonstrates that Netters possessed and misused official powers in connection with his position as a legislative aide, we hold that a "rational trier of fact could have found the essential elements of the crime [of official right extortion]

beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. The district court's decision to deny Netters' Rule 29 motion for judgment of acquittal was proper.

### B. *Notice of Prohibited Conduct*

■ Netters asserts that even if a non-elected, nonappointed, legislative employee may be found guilty of official right extortion, his convictions must be reversed because the Hobbs Act failed to give him adequate notice that his conduct was prohibited. "[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Varbel,* 780 F.2d 758, 760 (9th Cir.1986) (quoting *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983)).

Although Netters was not himself an elected official, the facts of this case demonstrate that, as a staff assistant to an elected official, he exercised considerable power in shepherding bills through the legislative process. The many cases upholding convictions for official right extortion of nonelected, nonappointed, government employees were adequate notice to Netters. *See, e.g., Wright,* 797 F.2d at 245; *Rindone,* 631 F.2d at 491; *Cerilli,* 603 F.2d at 415. The fact that Freeman had to assure Netters that FBI Agent Brennan was not "ab-scamming" him evidences Netters' understanding that his conduct was prohibited.

Furthermore, the plain language of the Hobbs Act applies to anyone acting "under color of official right." The ordinary person would understand the statute to mean that the misuse of official responsibilities and powers is unlawful. Thus, we reject Netters' contention that he lacked notice that his conduct was prohibited by the Hobbs Act.

### C. *Jury Instructions Defining "Under Color of Official Right"*

Netters challenges the district court's jury instruction # 40 as a misstatement of the law concerning acts "under color of official right." Specifically, Netters contends that the district judge instructed the jury that a legisla-tive employee could act "under color of official right" whenever that employee did his job.

"Whether a jury instruction misstates the elements of a statutory crime is a question of law reviewed de novo." *United States v. Johnson,* 956 F.2d 197, 199 (9th Cir.1992).

Jury instruction # 40 provided:

An individual employed by the Legislature, but who is not himself an elected official, may act "under color of official right" (1) if the employee exercised powers that are expressly or impliedly delegated to that employee by an elected official, or (2) if the employee acts with the apparent authority to exercise official powers, whether actually delegated or not, and the alleged victim believes that the employee is authorized to exercise such powers.

The district court also instructed the jury that to prove that the defendant acted "under color of official right," the Government was required to show specific conduct by the defendant demonstrating a corrupt intent to induce a payment. The district court made it clear that the mere acceptance of a payment by a public official, even when the public official knows that his office is the motivation behind the payment, is not extortion "under color of official right."

Finally, the district court advised the jury that it is not illegal, in and of itself, for a public official or legislative employee to solicit or accept campaign contributions from individuals who have a special interest in legislation. "If the payments the Government alleges were extorted were made in the form of campaign contributions, the Government must prove a quid pro quo, that is, that the payments were made in return for an explicit promise or undertaking by the defendant to perform or not to perform an official act."

When the district court's jury instructions are considered together, it becomes clear that Netters' argument that the district judge instructed the jury that a legislative employee could act "under color of official right" whenever that employee did his job is completely without merit. The district court

repeatedly emphasized that the Government must prove both that the defendant demonstrated a corrupt intent to induce a payment and that there was a quid pro quo, not simply a campaign contribution.

Because we hold that a nonelected, nonappointed, government employee may be found guilty of official right extortion, we approve the district court's instructions. They were neither misleading nor inadequate to guide the jury's deliberations. *See United States v. Joetzki,* 952 F.2d 1090, 1095 (9th Cir.1991).

#### D. *Netters' RICO Conviction*

Netters was convicted of violating RICO by conducting the affairs of an enterprise through a pattern of racketeering activity. *See* 18 U.S.C. § 1962(c). He challenges this conviction on several grounds.

##### 1. *The Pattern of Racketeering Requirement*

Section 1962(c) provides that it is unlawful for

any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

18 U.S.C. § 1962(c). "A violation of section 1962(c) requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

■ First, Netters argues that because he did not violate California Penal Code § 68, there are no predicate acts; therefore, there is no "pattern" of racketeering activity to support his conviction. California Penal Code § 68 provides:

§ 68. Bribes; executive or ministerial officers, employees, or appointees; asking or receiving; punishment

Every executive or ministerial officer, employee or appointee of the State of California, county or city therein or political subdivision thereof, who asks, receives, or agrees to receive, any bribe, upon any agreement or understanding that his vote, opinion, or action upon any matter then pending, or which may be brought before him in his *official capacity,* shall be influenced thereby, is punishable by imprisonment in the state prison for two, three or four years; and, in addition thereto, forfeits his office, and is forever disqualified from holding any office in this state.

(Emphasis added). Netters maintains that he could not have violated section 68 because he had no "official capacity" or "officially" defined duties as a legislative aide.

The plain language of the statute makes it clear that section 68 may be applied to Netters as an "employee ... of the State of California." Moreover, California courts have rejected "lack of official capacity" as a defense to the crime of bribery under section 68. *See People v. Megladdery,* 40 Cal.App.2d 748, 106 P.2d 84, 102 (1940) (private secretary to the governor); *see also People v. Silver,* 75 Cal.App.2d 1, 170 P.2d 80, 82 (1946) (acting investigator of the state board of architectural examiners). Thus, Netters, as a legislative aide, could be found guilty of violating section 68.

There was extensive evidence that Netters used his duties and responsibilities as a legislative aide to move two special interest bills through the California legislature in exchange for payments from the fictitious corporations, in violation of section 68. The Government proved the requisite number of predicate acts of bribery necessary to establish the existence of a "pattern" of racketeering activity. *See* 18 U.S.C. § 1961(5) ("pattern of racketeering activity" requires at least two acts of racketeering activity).

■ Second, Netters asserts that the Government failed to prove the existence of a "pattern" of racketeering activity because this case involved only one "activity"—the introduction of special interest legislation. He contends that the fact that there may have been two statutory offenses is irrelevant. Netters' contention that because all of the predicate acts related to a single scheme, there could be no "pattern" is simply meritless. *See United States v. Kirk,* 844 F.2d

660, 663–64 (9th Cir.), *cert. denied,* 488 U.S. 890, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988).

■ Third, Netters argues that even if there were two "racketeering acts," there is no "pattern" because there was no threat of continuing activity. The Supreme Court has concluded that although two predicate acts are needed for a pattern, Congress had a "fairly flexible concept of a pattern in mind." *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). The Government "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *See id.* (emphasis in original).

Racketeering predicates are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *See id.* at 240, 109 S.Ct. at 2901; *Ticor Title Ins. Co. v. Florida,* 937 F.2d 447, 450 (9th Cir.1991). In this case, the predicate state law bribery crimes were related as they had the same purpose—obtaining Netters' agreement to use his duties and responsibilities as a legislative aide to influence the legislative process. They also shared similar results, participants, and methods of commission. *See Dischner,* 974 F.2d at 1510 (evidence that defendants repeatedly solicited and accepted bribes in connection with public matters, and received substantial kickbacks from companies for steering public works contracts in their direction, satisfied RICO's "pattern" requirement; the consistency of their methods, purposes, results, and the participants involved made the predicate acts sufficiently related).

With respect to the continuity requirement, the Supreme Court has explained:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. [When] a RICO action [is] brought before continuity can be established in this way ... liability depends on whether the *threat* of continuity is demonstrated.

*H.J., Inc.,* 492 U.S. at 241–42, 109 S.Ct. at 2902. However, as Justice Scalia pointed out in his concurrence, it would be absurd to say that "at least a few months of racketeering activity ... is generally for free, as far as RICO is concerned." *Id.* at 254, 109 S.Ct. at 2908 (Scalia, J., concurring). If the predicate acts "involve a distinct threat of long-term racketeering activity, either implicit or explicit," a RICO pattern has been established. *Id.* at 242, 109 S.Ct. at 2902.

In this case, the evidence showed that Netters accepted a series of improper payments over a two-year period consistent with the closed-ended concept of continuity. *See Dischner,* 974 F.2d at 1507 (3 years); *Kirk,* 844 F.2d at 661 (2 years); *United Energy Owners v. United Energy Management,* 837 F.2d 356, 359 (9th Cir.1988) (15 months). Moreover, the nature of his crime and his statements suggest the existence of a distinct threat of long-term racketeering activity. *See Dischner,* 974 F.2d at 1510–11 (in political corruption cases, activities such as receiving bribes and kickbacks "feed on themselves so as to become a pattern").

The evidence demonstrated that the predicate state law bribery crimes were both related and amounted to or posed a threat of continued criminal activity. Thus, Netters' third attack on the Government's proof of a "pattern" of racketeering activity fails.

### 2. *The Enterprise Requirement*

Netters contends that the Government failed to prove the existence of an "enterprise" because neither the offices of the 49th Assembly District nor any other governmental or political entity constitutes an "enterprise" within the meaning of RICO. An "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group

of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The Ninth Circuit has never squarely addressed the issue raised by Netters, although we have ruled in a closely related situation. *See Dischner,* 974 F.2d at 1511 ("The statute adequately warned [defendants] that their association with each other and the Office of the Mayor and the Department of Public Works constituted a RICO enterprise."). However, seven other circuit courts have found that a government entity may constitute an "enterprise" within the meaning of RICO. *See United States v. Thompson,* 685 F.2d 993, 998–1000 (6th Cir.) (en banc), *cert. denied,* 459 U.S. 1072, 103 S.Ct. 494, 74 L.Ed.2d 635 (1982); *United States v. Dozier,* 672 F.2d 531, 543 & n. 8 (5th Cir.1982); *United States v. Angelilli,* 660 F.2d 23, 30–35 (2d Cir.1981), *cert. denied sub nom. Butler v. United States,* 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982); *United States v. Lee Stoller Enters., Inc.,* 652 F.2d 1313, 1316–19 (7th Cir.) (en banc), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981); *United States v. Clark,* 646 F.2d 1259, 1261–67 (8th Cir.1981); *United States v. Altomare,* 625 F.2d 5, 7 (4th Cir.1980); *United States v. Bacheler,* 611 F.2d 443, 450 (3d Cir.1979).

█ We adopt the view of seven circuit courts and hold that a governmental entity may constitute an "enterprise" within the meaning of RICO. Accordingly, we reject Netters' argument.

### 3. *Economic Motive as a Requirement*

█ Netters urges us to adopt the position of the Second and Seventh Circuits that a RICO violation requires both that the enterprise and the racketeering activity have an economic purpose. He asserts that neither the enterprise (the 49th Assembly District) nor the racketeering activity (the predicate state law bribery crimes) in this case had an economic purpose; therefore, his conviction cannot stand.

Contrary to Netters' contention, the Second and Seventh Circuits do not require that both the enterprise and the racketeering predicates have an economic motive. Rather, they require an economic motive for ei-

ther the enterprise *or* the predicate acts of racketeering. *See National Org. for Women v. Scheidler,* 968 F.2d 612, 614, 625–30 (7th Cir.1992), *cert. granted,* — U.S. ——, 113 S.Ct. 2958, 125 L.Ed.2d 659 (1993); *United States v. Ivic,* 700 F.2d 51, 58–65 (2d Cir. 1983); *see also United States v. Flynn,* 852 F.2d 1045, 1052 (8th Cir.), *cert. denied,* 488 U.S. 974, 109 S.Ct. 511, 102 L.Ed.2d 546 (1988); *compare Northeast Women's Center v. McMonagle,* 868 F.2d 1342, 1349–50 (3d Cir.), *cert. denied,* 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989). The predicate state law bribery crimes clearly had an economic motive. We hold that the economic motive of the predicate acts is sufficient to uphold a RICO conviction.

### 4. *The Constitutionality of the RICO Act*

█ First, Netters argues that the term "enterprise" is unconstitutionally vague as applied to the facts of this case. We rejected a comparable argument in *Dischner. See* 974 F.2d at 1511. "Nor do we find the 'enterprise' requirement vague as applied to [defendants'] conduct.... The statute adequately warned [defendants] that their association with each other and the Office of the Mayor and the Department of Public Works constituted a RICO enterprise." *Id.* (citations omitted).

█ Second, Netters asserts that the RICO statute is unconstitutional as applied to cases such as this one because it impermissibly infringes on states' rights to control their electoral processes. He adds that the statute is unconstitutional because it chills the exercise of First Amendment rights, namely the solicitation of campaign contributions. The Supreme Court decided a case which responds to this argument. *See McCormick v. United States,* 500 U.S. 257, ——, 111 S.Ct. 1807, 1816, 114 L.Ed.2d 307 (1991). Although the defendant state representative in *McCormick* was charged with violating the Hobbs Act rather than RICO, the Supreme Court's decision in that case controls this question.

In *McCormick,* the Court recognized that "[s]erving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday

business of a legislator[, and] ... campaigns must be run and ·financed." *McCormick,* 500 U.S. at ——, 111 S.Ct. at 1816. Nevertheless, "[p]olitical contributions are ... vulnerable ... if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.*

### E.   *Netters' Money Laundering Convictions*

Netters' only challenge to his convictions for money laundering is the absence of underlying criminal conduct. These convictions were predicated upon his violations of the Hobbs Act and bribery under California Penal Code § 68. Because we hold that the underlying criminal conduct occurred, we affirm Netters' convictions for money laundering.

### III.   FREEMAN'S CONVICTIONS

### A.   *Freeman's Rule 29 Motion for Judgment of Acquittal*

Freeman's Rule 29 motion challenged the application of the Hobbs Act to him. The indictment charged that Freeman conspired with and aided and abetted Netters in extortion in violation of the Hobbs Act.

Freeman's arguments are virtually identical to Netters' contentions. Freeman asserts that (1) Netters was not a "public official" and did not act "under color of official right" within the meaning of the Hobbs Act; (2) the district court's jury instruction defining "under color of official right" was erroneous; and (3) the Hobbs Act did not give Netters fair notice that his conduct was prohibited. Our decisions as to the. same arguments advanced by Netters control.

■■■   With respect to Freeman's contention that application of the Hobbs Act in this case runs counter to First Amendment jurisprudence, the Supreme Court decision in *McCormick* controls. The Court made it clear that campaign contributions made in return for an explicit promise or undertaking by an official to perform or not to perform an official act are vulnerable. *McCormick,* 500 U.S. at ——, 111 S.Ct. at 1816. In light of the evidence of a quid pro quo in this case, Freeman's argument fails.

### B.   *Freeman's Motion to Sever*

■■■   Freeman argues that the district court erred in denying his motion to sever his trial from Netters' trial. We review a district court's decision as to whether to sever pursuant to Federal Rule of Criminal Procedure 14 for an abuse of discretion. *United States v. Cuozzo,* 962 F.2d 945, 949 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 475, 121 L.Ed.2d 381 (1992); *United States v. Unruh,* 855 F.2d 1363, 1374 (9th Cir.1987), *cert. denied,* 488 U.S. 974, 109 S.Ct. 513, 102 L.Ed.2d 548 (1988).

Freeman bears the burden of proving that the joint trial caused such clear, manifest, or undue prejudice that he was denied a fair trial. *See Cuozzo,* 962 F.2d at 950. "The court's prejudice inquiry focuses on 'whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in light of its volume and limited admissibility.'" *Unruh,* 855 F.2d at 1374 (quoting *United States v. Ramirez,* 710 F.2d 535, 546 (9th Cir.1983)).

A joint trial was particularly appropriate in this case because conspiracy was charged. *See United States v. Hernandez,* 952 F.2d 1110, 1114 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 334, 121 L.Ed.2d 252 (1992). As Freeman was charged with both conspiracy and aiding and abetting, it was necessary for the jury to consider evidence of and understand the conduct for which Netters was charged.

Moreover, the jury could reasonably have been expected to compartmentalize the evidence as the individuals who were involved with and testified to the events in 1986, with which Freeman was concerned, were different from the individuals who were involved with and testified to the events of 1988. The Government took care to present the evidence and testimony in a manner that would highlight the distinction between the 1986 and 1988 activities. The fact that almost a full year elapsed between the end of the alleged 1986 Hobbs Act conspiracy in December 1986, and the beginning of Netters' activities concerning AB 4203 in January 1988,

also facilitated the jury's ability to compartmentalize the evidence.

Most important, the district court repeatedly instructed the jury during the trial as to which testimony was admissible only against Netters, which testimony was admissible only against Freeman, and which testimony was admissible against both men. At the conclusion of the trial, the district court again instructed the jurors:

> Even though more than one defendant is on trial, you have to consider the evidence as to each defendant separately. In deciding whether the Government has proven its case against a defendant beyond a reasonable doubt, you cannot consider evidence which was admitted only against someone else.

Jury instruction # 8.

> A separate crime is charged in each count of the indictment. Each charge and the evidence having to do with that charge must be considered separately. Just because you find the defendants guilty or not guilty of one of the offenses charged should not affect your decision on any other count.

Jury instruction # 4.

"[W]here, as here, the district court uses great diligence in instructing the jury to separate the evidence, severance is unnecessary because the prejudicial effects of the evidence of codefendants are 'neutralized.'" *United States v. Patterson,* 819 F.2d 1495, 1503 (9th Cir.1987); *see also United States v. Conners,* 825 F.2d 1384, 1391 (9th Cir.1987); *United States v. Polizzi,* 801 F.2d 1543, 1554 (9th Cir.1986); *United States v. Douglass,* 780 F.2d 1472, 1479 (9th Cir.1986). Thus, we conclude that the district court's denial of Freeman's motion to sever was not an abuse of discretion.

C. *Admission of Evidence of Money Paid to Freeman*

■ Freeman asserts that the district court's admission of evidence of money paid to him for his assistance in securing a loan guarantee for Gulf Shrimp from Superior Valley Small Business Development Corpora-

tion violated Federal Rules of Evidence 403 and 404(b).

The Government maintains that the evidence was properly admitted as "'direct evidence,' used to flesh out the circumstances surrounding the crime with which the defendant [was] charged, thereby allowing the jury to make sense of the testimony in its proper context." *United States v. Ramirez–Jiminez,* 967 F.2d 1321, 1327 (9th Cir.1992). According to the Government, the evidence in question was inextricably intertwined with Freeman's discussions with undercover FBI Agent Brennan concerning the fictitious corporation's need for special interest legislation, and it showed how the relationship between Freeman and Brennan developed.

Freeman concedes that the evidence of his meeting Brennan and developing a relationship with him concerning Gulf Shrimp was arguably intertwined with the crimes charged. However, he asserts that the specific references to the $2,000 in payments easily could have been excised without preventing the Government from putting the testimony in context. Although the district court may have been able to excise the reference, the district court did not abuse its discretion in declining to excise it.

In addition, the Government contends that it offered this evidence to refute Freeman's contentions that he lacked the requisite intent to commit the Hobbs Act charges against him. "Rule 404(b) permits the introduction of evidence for purposes such as proving a person's 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Ramirez–Jiminez,* 967 F.2d at 1325. Freeman's acceptance of the payments tended to prove that he knew the purpose of the payments and, thus, possessed the requisite intent. *See United States v. Price,* 617 F.2d 455, 459 (7th Cir.1979); *see also United States v. Mundi,* 892 F.2d 817, 820 (9th Cir.1989), *cert. denied,* 498 U.S. 1119, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991).

Freeman objects to the Government's argument on the ground that the Government offered this evidence before he testified as to innocent explanations for his behavior. Freeman concedes, however, that his intent

was a material issue at trial. Thus, this evidence of intent was appropriately introduced in the Government's case in chief.

### D. *Jury Instruction on Entrapment*

■ Freeman argues that the district court should have instructed the jury on the defense of entrapment because there was sufficient evidence to support an entrapment instruction and to refute any claim that he was predisposed to commit a Hobbs Act violation. Although an entrapment instruction was requested as an initial matter, the request was voluntarily withdrawn. Consequently, we review for plain error. *See United States v. Guthrie*, 931 F.2d 564, 567 (9th Cir.1991); *Ward*, 914 F.2d at 1344. "The reversal of a criminal conviction on the basis of plain error is an exceptional remedy, which the court should invoke 'only when it appears necessary to prevent a miscarriage of justice or to preserve the integrity and reputation of the judicial process.'" *Ward*, 914 F.2d at 1344 (quoting *United States v. Bustillo*, 789 F.2d 1364, 1367 (9th Cir.1986)).

"In order to establish entrapment a defendant must show: (1) that he was induced to commit the crime by a government agent; and (2) that he was not otherwise predisposed to commit the crime." *United States v. Busby*, 780 F.2d 804, 806 (9th Cir.1986). The district court must instruct on entrapment only if the defendant presents some evidence of both elements of the defense. *Id.*

We will assume, for purposes of argument, that Freeman produced sufficient evidence to satisfy the first element of the entrapment defense as Brennan, who posed as the owner of Gulf Shrimp, was an FBI agent at the time of the alleged inducement. To determine, however, whether Freeman satisfied the second element, we must consider:

> the character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion;

and the nature of the inducement or persuasion supplied by the Government.

*Id.* at 807. None of the factors is controlling; however, the defendant's reluctance to engage in criminal activity is the most important. *Id.*

Freeman argues that there is ample evidence that he was not predisposed to violate the Hobbs Act. He asserts that the FBI agent initiated contact with him, offered him a job as a lobbyist despite the fact that he had no prior lobbying experience, and raised the subject of making contributions to Assemblyperson Moore. Freeman also points out that the Government drafted the special interest legislation.

We agree with the Government that Freeman's predisposition was evidenced as early as February, 1982, before the Government even conceived of a "sting bill," when he told Marvin Levin that he could, as a Assembly staff member, obtain certain special interest legislation in return for payments to legislators. Freeman made similar statements in March of 1982. These statements show that Freeman was predisposed to violate the Hobbs Act prior to late 1985, when the Government initiated its undercover investigation. Moreover, there was a significant amount of evidence that Freeman demonstrated no reluctance to engage in criminal activity. Freeman has not demonstrated that the district court's failure sua sponte to give the jury an entrapment instruction was plain error.

### E. *Double Jeopardy*

■ Freeman was named in two counts of the indictment, which charged him with "conspiracy to affect commerce by extortion under color of official right" in violation of 18 U.S.C. § 1951 and "extortion under color of official right; aiding and abetting" in violation of 18 U.S.C. §§ 1951 and 2. He argues that the charges are duplicitous; therefore, convicting and punishing him separately for each charge unconstitutionally punished him twice for the same conduct.

Despite the fact that Freeman failed to raise this issue before the district court, he has not waived it. *See Launius v. United*

*States,* 575 F.2d 770, 772 (9th Cir.1978). As a result of his failure, however, we will employ a plain error standard of review. *See Dischner,* 974 F.2d at 1514; *United States v. Hernandez,* 876 F.2d 774, 777 (9th Cir.), *cert. denied,* 493 U.S. 863, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989).

Freeman concedes that the offense of conspiracy requires proof of a fact—an agreement—which the offense of aiding and abetting does not. In addition, he acknowledges that courts have traditionally upheld convictions for conspiracy in violation of 18 U.S.C. § 371 and aiding and abetting in violation of 18 U.S.C. § 2 based upon the same conduct. Nevertheless, Freeman contends that the traditional distinction between these offenses does not hold true in the context of the Hobbs Act because both offenses violate the same statute.

It is well settled that conspiracy to violate the Hobbs Act and a substantive violation of the Hobbs Act based on the same conduct are two separate offenses and may be punished by consecutive sentences. *Callanan v. United States,* 364 U.S. 587, 597, 81 S.Ct. 321, 327, 5 L.Ed.2d 312 (1961) (defendant convicted of conspiring to obstruct commerce by extorting money and the substantive offense of obstructing commerce by extortion, both in violation of the Hobbs Act); *United States v. Phillips,* 577 F.2d 495, 501 (9th Cir.), *cert. denied,* 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978) (based on the same acts, defendant charged with conspiracy and attempted extortion, both in violation of the Hobbs Act); *Carbo v. United States,* 314 F.2d 718, 733 & n. 17 (9th Cir.1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964) ("The conspiracy and substantive offenses under § 1951 do not merge."). Moreover, it is clear that a defendant may be convicted and separately punished for aiding and abetting and conspiring to commit the same substantive offense. *See Pereira v. United States,* 347 U.S. 1, 11–12, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954); *United States v. Huber,* 772 F.2d 585, 591–92 (9th Cir.1985). Freeman's argument fails.

* The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P.

34(a); 9th Cir.R. 34–4.

IV. CONCLUSION

The convictions of both appellants are **AFFIRMED.**