70 F.3d 1280
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Frank HILL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Terry FROST, Defendant-Appellant.
 Nos. 94-10498, 94-10500.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 17, 1995.
Decided Nov. 27, 1995.
 
 Before: SKOPIL, PREGERSON, and FERNANDEZ, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Frank Hill, a former California state legislator, and Terry Frost, a former legislative aide, appeal their Hobbs Act convictions. Both contend that the indictment was insufficient, that there was insufficient evidence to support their convictions, and that the government's "sting" operation violated the Tenth Amendment. Frost also challenges the jury instructions, and Hill contends that the district court erred by admitting evidence of other defendants' wrongdoing, participating improperly in the trial proceedings, and refusing to depart from the sentencing guidelines. We reject these contentions, and we affirm.
 
 1. Sufficiency of the Indictment
 
 3
 The indictment charged defendants with conspiracy to commit extortion as defined by 18 U.S.C. Sec. 1951(b)(3), "by obtaining and causing to be obtained under color of official right money payments totalling $12,500 which were not lawfully due defendants ... in connection with legislation identified [as California State Legislature Assembly Bill 4203]." Hill was also charged with extortion for obtaining "under color of official right a $2500 payment, which payment was not due Frank C. Hill or his office" in connection with the same legislation. Both Hill and Frost challenge the mere recitation of "under color of official right" as inadequate, contending that the government's failure to allege specific "official acts" prevented them from adequately preparing a defense.
 
 
 4
 The phrase "under color of official right" appears in 18 U.S.C. Sec. 1951(b)(2), where the term "extortion" is defined as "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." (emphasis added). In McCormick v. United States, 500 U.S. 257, 273 (1991), the Supreme Court interpreted this language to require the government to prove a quid pro quo that "the payments are made in return for an explicit promise or undertaking by the official to perform or not perform an official act."
 
 
 5
 Hill and Frost thus contend that the indictment should have alleged explicit promises or undertakings to perform or not perform official acts. The district court rejected that contention, concluding that the quid pro quo requirement does not add a new or implied element to the Hobbs Act, but merely defines the statutory term "under color of official right." The court reasoned that it is sufficient for the government to plead the crime generally in the language of the statute and then add specific averments, such as "the date the defendant received the money, the specific amount received, and in connection with specific named legislation."
 
 
 6
 We agree with the district court. An indictment must set forth the elements of the charged offense. United States v. Woodruff, 50 F.3d 673, 676 (9th Cir.1995). In this circuit, "[t]he use of a 'bare bones' information--that is one employing the statutory language alone--is quite common and entirely permissible so long as the statute sets forth fully, directly and clearly all essential elements of the crime." Id. (internal quotation omitted). "[I]t is not necessary to plead ... evidentiary detail." Id. (internal quotation omitted). The indictment in this case was sufficient. Accordingly, we also reject Frost's contention that the district court should have granted his request for a bill of particulars. See United States v. Giese, 597 F.2d 1170, 1180 (9th Cir.) (bill of particulars is not necessary when the indictment is adequate), cert. denied, 444 U.S. 979 (1979).
 
 2. Sufficiency of the Evidence
 
 7
 Hill argues that the government failed to prove a quid pro quo. He contends that the evidence shows his support for the legislation long before the honorarium was arranged. Hill also relies on testimony indicating that he understood that the honorarium was payment for his attendance at the meeting. Finally, he notes that he properly reported the honorarium in compliance with state law and paid taxes on the amount.
 
 
 8
 We reject Hill's argument. Watson's testimony clearly indicates that Hill understood that he was receiving money in exchange for his support of the legislation. She testified that she told Hill that "we are going to be receiving $10,000 in contributions to the Republicans as a result of our help on this bill." Watson stated that "Hill was taking money for the bill" and that "Hill knew that what they were doing was illegal." Hill's recorded statements to Miller belie his claim that he did not agree to accept payment in exchange for his support of the bill. Hill carefully explained to Miller everything that Hill was doing in support of the legislation. Miller testified that he understood that he was paying $2500 to Hill in exchange for Hill's influence. The jury was entitled to believe Watson and Miller, and to discredit Hill's explanation.
 
 
 9
 Frost also claims that the government failed to prove that the payments were made in return for an explicit promise to perform official legislative acts. We reject that claim. Although Frost did not receive any money, there is evidence of his participation in the conspiracy to exchange money for legislative support. Frost told Shahabian that Republican assistance was available if the Republicans would "share in the spoils," a term that Frost conceded at trial meant money. Frost also spoke to Shahabian about how much money would be available, agreeing that $10,000 was "probably more than enough." Frost also admitted that he served as a "conduit," discussed the amount of money with Watson and relayed information between Shahabian and Watson. Watson testified that Frost wanted "all conversations about money to go through him ... it was my understanding that he was protecting me, and he mentioned the possibility of a grand jury investigation, and there would be deniable culpability, and we could say we hadn't talked to each other."
 
 
 10
 Notwithstanding these statements, Frost contends that he conspired only with Shahabian who was serving as an agent or representative of Miller. He argues that he was therefore acting only on behalf of the "victim" of the extortion rather than the "official" actors. The evidence does not support Frost's contention. Rather, his statements and actions indicate that he was acting in his capacity as a legislative aide and was seeking to maximize the amount of "contributions" from Miller in exchange for legislative support.
 
 
 11
 Frost also contends that he believed that the contributions were lawfully made by a lobbyist who sought to build relationships with legislators, and specifically, to obtain access to Republicans. See United States v. Carpenter, 961 F.2d 824, 827 (9th Cir.) (granting or denying access to lobbyist based on campaign contributions is not an official act within the meaning of Hobbs Act), cert. denied, 113 S.Ct. 332 (1992). The evidence amply demonstrates, however, that Frost knowingly participated in the conspiracy involving Nolan, Watson, and Hill in which Hill and Nolan unlawfully agreed to exchange official legislative assistance in return for money. A conspiracy in which there is agreement "to support legislation in return for contributions is entirely different from granting or denying access." Id. Moreover, there is no question that nonelected, nonappointed government employees, who are not empowered to vote, may nevertheless violate the Hobbs Act by improperly wielding their influence in return for payment. United States v. Freeman, 6 F.3d 586, 593 (9th Cir.1993), cert. denied, 114 S.Ct. 1661 (1995).
 
 3. Tenth Amendment Violation
 
 12
 Hill and Frost claim that the government's sting operation created an unconstitutional interference with the sovereignty of California in violation of the Tenth Amendment. We reject that claim. First, there is a strong argument that Hill and Frost lack standing to assert a Tenth Amendment claim on behalf of the state. See United States v. Duque, 62 F.3d 1146, 1151 (9th Cir.1995). Second, the Tenth Amendment does not bar the federal government from enforcing federal criminal laws. See United States v. Andaverde, 64 F.3d 1305, 1310 (9th Cir.1995). Finally, we have already rejected the argument that a very similar sting operation was improper government conduct. Carpenter, 961 F.2d at 829.
 
 4. Jury Instructions
 
 13
 Frost contends that the district court erred by instructing the jury that "[a] legislator's agreement to intervene with fellow legislators or the governor to secure their support for legislation constitutes an 'official act' within the meaning of the Hobbs Act." He contends either that the jury should have decided what constitutes "official acts" or, assuming that the court was justified in defining "official acts," its instruction was vague and incomplete.
 
 
 14
 We conclude that the district court properly instructed the jury. The court did not direct the jury to find that Frost committed an official act. Frost was free to argue and the jury was free to decide that the defendants in this case did not commit actions that the court defined as "official acts." Nor was the trial court's definition of official acts vague or misleading. In Carpenter, 961 F.2d at 827, we observed that "[a]greeing to vote for or against legislation in exchange for a contribution clearly falls within the ambit of the Hobbs Act, for voting is a legislator's quintessential 'official act.' Likewise, agreeing to intervene with one's colleagues to secure their support for legislation involves an 'official act.' " (emphasis added).
 
 
 15
 Frost also complains that the evidence and the court's instructions caused a constructive amendment to the indictment. "A constructive amendment occurs when the proof at trial supports a crime other than the crime charged in the indictment." United States v. Molinaro, 11 F.3d 853, 861 n. 17 (9th Cir.1993), cert. denied, 115 S.Ct. 668 (1994). The evidence and instructions here conformed to the charges of the indictment. This is not a case where "the crime charged is substantially changed at trial, so that it is impossible to know whether the grand jury would have indicted for the crime actually proved." United States v. Reese, 2 F.3d 870, 891 (9th Cir.1993) (internal quotation omitted), cert. denied, 114 S.Ct. 928 (1994).
 
 5. Judicial Misconduct
 
 16
 Hill contends that he was denied a fair trial by the trial judge's participation in the trial proceedings. We disagree. "Federal judges have broad discretion in supervising trials, and their behavior during trial justifies reversal only if there is an abuse of discretion." United States v. Laurins, 857 F.2d 529, 537 (9th Cir.1988), cert. denied, 492 U.S. 906 (1989). The judicial misconduct alleged here pales in comparison to the length and complexity of the trial. Moreover, the record shows that while the trial court maintained strict control of the proceedings, its actions were applied evenhandedly.
 
 6. Evidentiary Rulings
 
 17
 Hill complains that Watson's extensive testimony regarding wrongdoings by her and Nolan was extremely prejudicial and permitted the jury to convict Hill of "guilt by association." The district court noted, however, that "evidence of Watson's duties as special assistant to the Republican Caucus and its leader Nolan, and during which a portion of the time Hill supervised her work, was admitted because it was inextricably intertwined with evidence of the offenses charged." The court explained that "[h]ow Watson did her work as special assistant in maximizing contributions in connection with pending legislation constituted circumstantial evidence corroborative of her testimony in connection with the shrimp bill." Moreover, the court reasoned that evidence of Watson's activities was relevant "in view of Hill's testimony contradicting Watson's testimony in connection with her description of her job functions." Finally, the judge concluded that Watson's testimony was "circumstantial evidence of defendant Hill's criminal knowledge." The record thus shows that the trial judge properly and carefully weighed the probative value of the evidence against its prejudicial effect.
 
 7. Sentencing
 
 18
 Hill contends that the district court erred by not departing from the sentencing guidelines due to the harshness of applying U.S.S.G. Sec. 2S1.1 to his money laundering conviction. The district court elected not to depart, stating that "even if I had the discretion under this heartland argument to depart down I would not in this case." The trial court's discretionary refusal to depart from the Sentencing Guidelines is not reviewable on appeal. United States v. Eaton, 31 F.3d 789, 792 (9th Cir.1994).
 
 
 19
 Hill also claims that the Guideline should not be applied to him at all because it does not cover his offense. He did not raise this issue in the district court. Therefore, he has waived it. See United States v. Hernandez-Rodriquez, 975 F.2d 622, 628 (9th Cir.1992). Even if we review Hill's claim, our review is limited to plain error. United States v. Ulysses-Salazar, 28 F.3d 932, 938 (9th Cir.1994), cert. denied, 115 S.Ct. 1367 (1995). There is no plain error here. See United States v. Olano, 113 S.Ct. 1770, 1777 (1993). In fact, the offense fell within the plain meaning of section 2S1.1.
 
 
 20
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3